**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Joseph Lapp and Roxann Lapp, | ) | |
| | ) | |
| Plaintiffs, | ) | 2:06-cv-2986-CWH |
| | ) | |
| vs. | ) | |
| | ) | |
| Maersk Lines Limited, A.P. Moller Maersk | ) | **ORDER** |
| A/S d/b/a Maersk-Sealand, | ) | |
| U.S. Ship Management, Inc., Moran | ) | |
| Environmental Recovery, LLC, | ) | |
| Cheminova A/S and Cheminova, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

This matter is before the Court on the motion for summary judgment of the defendants

U.S. Ship Management, Inc. ("USSM) and Maersk Lines Limited ("MLL"), in its capacity as

USSM's successor, as to all claims asserted against USSM, as to the second cause of action

against MLL based on MLL's assumption of USSM's liability,[1] and as to Roxann Lapp's loss of

consortium claim against MLL to the extent it is based on the aforementioned second cause of

_____

[1] The second cause of action in the amended complaint states:

**SECOND CAUSE OF ACTION**
**MAERSK'S ASSUMPTION OF USSM'S LIABILITY**

***

55.    That, subsequent to the events set forth in this Complaint, MAERSK terminated its time
       charter with USSM and took over the ownership and operation of the SEA LAND
       PRIDE.
56.    That Maersk assumed all of the outstanding liabilities and obligations that USSM had
       arising out of the operation of the SEA LAND PRIDE.
57.    That, as a result thereof, Maersk, is liable to the plaintiffs, for any negligent acts and all
       other liabilities of USSM.

action.  Only the causes of action alleged against USSM and MLL, in its successor capacity, are

the subject of the pending motion for summary judgment.  As against these parties, the plaintiffs

allege negligence under § 905(b) of the Longshore Harbor Workers Compensation Act, 33

U.S.C. § 901, *et seq.*

I.    **Plaintiff's Allegations**

Joseph Lapp ("Lapp") and Roxann Lapp are residents of Jensen Beach, Florida.  Lapp

was employed by USSM as a port engineer.  Lapp is a harbor worker within the meaning of the

LHWCA.  The USSM conducts business out of the port of Charleston, South Carolina and was

the bareboat charterer and owner *pro hac vice* of a container ship known as the SEALAND

PRIDE.  MLL is a corporation that conducts business out of the port of Charleston, South

Carolina that was engaged in the operation of the SEALAND PRIDE.  USSM has since

liquidated and certain of its liabilities have been assumed by the vessel's former time charterer,

MLL (hereinafter collectively referred to as "USSM").

Cheminova A/S ("Cheminova"), a Danish business entity, contracted with MLL to

transport a quantity of the liquid pesticide malathion, a hazardous material, from Europe to the

United States.  In February of 2004, Cheminova loaded the malathion in 260-gallon plastic or

rubber bladders onto the SEALAND PRIDE and into a conventional steel shipping container to

be transported across the Atlantic Ocean.  During the transatlantic crossing from Bremerhaven,

Germany, to Charleston, South Carolina, the SEALAND PRIDE encountered heavy weather.

On February 19, 2004, several containers located towards the bow of the SEALAND PRIDE

were damaged, broken open, and/or washed over the side.  The bladders of the damaged

malathion containers were breached, and malathion spilled onto the decks, bulwarks, sides, and

metal structures of the SEALAND PRIDE.  One of the containers loaded with malathion was torn from its position on the forward deck, upended, and bent over the ship's rail, where it remained lodged until it could be removed with emergency gear in Charleston, South Carolina.

On February 25, 2004, the USSM retained the defendant Moran Environmental Recovery, LLC's ("Moran") spill management team to oversee the safe cleanup and remediation of the spilled malathion.  Lapp, who was employed in USSM's fleet repair group as a port engineer, was sent to the SEALAND PRIDE when the vessel was anchored off of Charleston, South Carolina, to assist in the surveying of the damage and the cleanup/remediation of the malathion.  On February 28, 2004, he made another trip to the anchorage to inspect the vessel's damage and to write up the necessary repairs.  He was not provided with or advised to wear Personal Protective Equipment ("PPE"), such as a respirator, goggles, or a Tyvex suit.

As part of his job, Lapp surveyed the damaged vessel, called in contractors to take care of the repairs, approved payment to the shipyard, and addressed various problems on the vessel. Roger Franz, USSM's manager of fleet operations, testified that Lapp's job was to set up and oversee repair to the ship.  On March 5, 2004, Lapp came aboard the vessel again to look at the damage and to work on plans for repairs after the ship had discharged its cargo and shifted to Pier Zulu at the former Charleston Naval Station.

From Pier Zulu, the SEALAND PRIDE shifted to a nearby pier at Detyens Shipyards, Inc. ("Detyens"), where Lapp continued to spend time aboard the vessel because he was involved with the repair work done at that facility.  Lapp asserts that he spent twelve hours a day, seven days a week aboard the vessel monitoring the progress of repairs.  He was not instructed to wear any PPE until March 11, 2004.  The plaintiffs assert that during Lapp's work aboard the

SEALAND PRIDE, Lapp was negligently exposed to malathion and sustained malathion poisoning.

## II.    Procedural History

On October 19, 2006, the plaintiffs brought this action against the defendants for maritime tort, negligence, strict liability, and loss of consortium.  Jurisdiction is predicated upon 28 U.S.C. § 1333 general maritime and admiralty jurisdiction.  On March 27, 2008, the defendants USSM and MLL, in its capacity as USSM's successor, moved for summary judgment as to all claims asserted against USSM, as to the second cause of action against MLL, and as to plaintiff Roxann Lapp's consortium claim against MLL, to the extent that it is based on the aforementioned second cause of action.  On April 9, 2008, the plaintiffs responded in opposition to the motion for summary judgment.  On July 14, 2008, the defendants replied to the plaintiffs' response in opposition to the motion for summary judgment.  On July 31, 2008, this case was unsuccessfully mediated.  On October 20, 2008, the Court held a hearing on the motion and took it under advisement.

## III.    Standard for Deciding a Motion for Summary Judgment

When a party has moved for summary judgment, the judgment sought shall be rendered forthwith if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact and (2) he is entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of

the case under the applicable law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 247, 248 (1986).

An issue of such material fact is "genuine" if the evidence so offered is such that a reasonable

jury might return a verdict for the non-movant.  <u>Id</u>. at 257.  In determining whether a genuine

issue has been raised, the court must construe all inferences and ambiguities against the movant

and in favor of the non-moving party.  <u>U.S. v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

**IV.     Motion for Summary Judgment as to all Claims Asserted against USSM**

The plaintiffs allege that the defendants were negligent under § 905(b) of the Longshore

Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. § 901, *et seq.*  USSM asserts that

the undisputed facts of this case establish that USSM and its successor, MLL, are as a matter of

law immune from the plaintiffs' claims under certain provisions of the LHWCA.  The defendants

assert that if Lapp were employed to provide shipbuilding, repairing, or breaking services within

the meaning of the LHWCA, the plaintiffs are excluded from recovery based on the defendants'

negligence.  Therefore, the issue in this motion for summary judgment is whether Lapp was

employed to provide shipbuilding, repairing, or breaking services within the meaning of the

LHWCA.

A.     Coverage Under the LHWCA

In order to qualify for coverage under the LHWCA, the maritime worker must meet both

"status" and situs" requirements.[2]  Section 902(3) of the LHWCA defines who is considered an

employee:

> The term "employee" means any person engaged in maritime
> employment, including any longshoreman or other person engaged
> in longshoring operations, and any harbor-worker including a ship

---

[2] The parties do not dispute that Lapp qualifies for coverage under the LHWCA.

repairman, shipbuilder, and ship-breaker . . . .

The statute provides examples of several enumerated occupations such as longshoremen, ship

repairmen, and shipbuilders.  The list in the statute is not exclusive, and individuals engaged in

other types of occupations can fall under § 902(3) if they are sufficiently maritime in nature.

P.C. Pfeiffer Co., Inc. v. Ford, 444 U.S. 69, 82 (1979).  In their complaint, the plaintiffs allege

that Lapp qualifies as a "harbor worker" for purposes of the LHWCA.  Lapp was engaged in

"maritime employment" which involved overseeing the repairs of the vessel, therefore satisfying

the status requirement.  Section 903(a) of the LHWCA covers injuries or deaths that occur

> upon the navigable waters of the United States (including any
> adjoining pier, wharf, dry dock, terminal, building way, marine
> railway, or other adjoining area customarily used by an employer
> in loading, unloading, repairing, dismantling, or building a vessel).

The plaintiffs allege that Lapp's injuries occurred on navigable waters, therefore satisfying the

situs requirement.  Lapp qualifies for coverage under the LHWCA because he satisfies both the

"status" and "situs" requirements under §§ 902(3) and 903(a), respectively.  Lapp is receiving

LHWCA compensation from his former employer, USSM.

     B.      Recovery Under the "Dual Capacity" Doctrine

In this action, Lapp alleges that he also can recover from USSM in its capacity as vessel

owner under the "dual capacity doctrine," but the defendants disagree.  Section 905(b) of the

LHWCA allows an injured longshoreman or harbor worker to bring a negligence action against a

vessel.[3]  Where the owner of the vessel is also the employer of the maritime worker, the "dual

---

[3] Section 905(b) states in part: "In the event of injury to a person covered under this
chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to
recover damages by reason thereof, may bring an action against such vessel as a third party in
accordance with the provisions of section 933 of this title, and the employer shall not be liable to

capacity" doctrine allows a maritime worker to sue his owner-employer for negligence in its capacity as a vessel owner.  In Levene v. Pintail Enterprises, Inc., the court explained that "[f]requently . . . a longshoreman is injured on a vessel owned by his employer.  When an employer acts in a dual capacity as a vessel owner, the entity retains its immunity for acts taken in its capacity as an employer, but may still be sued 'qua vessel' for acts of vessel negligence." 943 F.2d 528, 531 (5th Cir. 1991).  In 1984, Congress amended § 905(b) of the LHWCA to limit this "dual capacity" exception.  Now, under 33 U.S.C. § 905(b), there are restrictions on the right to sue with respect to certain classifications of employees.[4]  An injured employee cannot bring an action in tort against his employer that is the owner of the vessel where the employee is engaged in one of the "harbor worker" occupations, such as shipbuilding, repairing, or breaking services.  The parties dispute whether Lapp was engaged in shipbuilding, repairing, or breaking services under § 902(3) of the LHWCA.

>1.     Ship Repairman Status under the LHWCA

The plaintiffs assert that as a port engineer, Lapp was an office employee who in the year prior to the accident spent at most fifty days at a shipyard or on board the ship and that he did not perform ship repair services.[5]  In the complaint, the plaintiffs state that Lapp was a harbor

_____

the vessel for such damage directly or indirectly and any agreements or warranties to the contrary shall be void."

[4] The "dual capacity" exception was limited by § 905(b) of the LHWCA, which provides: "If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) . . . ."

[5] The LHWCA excludes "individuals employed exclusively to perform office, clerical, secretarial, security, or data processing work" from the definition of "employee."  33 U.S.C. §

worker within the meaning of 33 U.S.C. § 901, *et seq*. Lapp would receive work orders from the ship as to what work had to be done.  Occasionally, he would go aboard the ship to survey what repairs were needed, to draft the specifications for the work, and to bid the work out to an independent shipyard.  Lapp would approve payment to the shipyard upon successful completion of the work.  Furthermore, the plaintiffs argue that Lapp did not have any authority to supervise the workers doing the repairs nor could he tell the shipyard or contractor how to do the job.  In their opposition to the defendants' motion for summary judgment, the plaintiffs assert that Lapp, in his position as a port engineer, did "not do any of the repairs to the vessel himself, nor does he supervise the manner in which the contractors do the work.  He falls within the group of workers such as surveyors, naval architects and estimators who do not perform or supervise the repairs."

The defendants claim that based on the record it is evident that Lapp is a harbor worker who was directly involved with and supervised the repair of the vessel, and thus falls under the LHWCA.  Lapp provided a "Job Description of Port Engineers duties" in response to the defendants' subpoena.  In describing his job duties, it appears that his job was much more involved than that of an office worker, that he had supervisory authority over the workers doing the repairs, and that he could tell the contractors how to do the required jobs.  In Lapp's job description of a Port Engineer, he described himself as a "Jack of all Trades" who dealt with everything onboard the vessels "from the structural, electrical, electronics, mechanical, and plumbing."  (Joseph Lapp's Description of Port Engineer Job Duties, Docket # 52-2).  In describing his job as a Port Engineer, Lapp states that the decisions he made "always had to be correct as not to jeopardize the safety of the vessel or the cost of human life aboard those ships

---

902(a).

sailing them. There is no AAA out in the middle of the Ocean when these ships broke down from not doing the job correctly." (Joseph Lapp's Description of Port Engineer Job Duties, Docket # 52-2). In describing his duties to repair the SEALAND PRIDE, Lapp stated that he had to "[s]urvey what was damaged by the storm and how we needed to repair it once the ship was allowed to come into the port." (Joseph Lapp's Deposition, Docket #49-2). Furthermore, when describing the repairs to the vessel in his deposition, Lapp states that the repairs required "us" to remove paint with high-pressure water-blasting. He also uses the word "we" in describing the task of applying bleach to the vessel surfaces to neutralize the malathion pesticide that had spilled onboard the SEALAND PRIDE.

Finally, the defendants point out the email from Lapp to Loy Stewart of Detyens Shipyards, which recaps a discussion between Lapp and shipyard personnel about how to get the SEALAND PRIDE back in service by March 26, 2004. In the email, Lapp considers whether "complete removal of the wave break will be quicker to access areas of the fore deck which will need to be doubled or if inserting of the areas will take the same amount of time, do so." (Email, Docket # 52-4). Thereafter, he states, "[t]his can be decided with you and I when the time comes." Id. The record indicates that Lapp was directly involved in the repairs to the SEALAND PRIDE. His job required him to work closely with repair contractors to make sure repairs were completed properly and on time. The defendants refer to testimony in Lapp's LHWCA claim where he testified that a port engineer must hire repair contractors and "instruct them what to do." (Joseph Lapp's Deposition, Docket 52-4). Furthermore, he testified that "[i]f it was bad enough, they would send us to tend ship and organizing everything on site. You ran the whole job. You made sure that everything was done according to regulation and efficiently

in an economic manner."  Id.  In the deposition of the general manager of fleet operations, Roger

Franz ("Franz"), Franz asserted that Lapp was "involved in the process of getting the ship

repaired so it would be back in safe operating condition."  (Deposition of Roger Franz, Docket #

49-3).  Franz testified that Lapp did not physically perform the repairs or direct the contractor's

every action but was highly involved in the repair process.  The Court must consider the case law

in order to determine whether Lapp's involvement in the repair process would place him in the

category of a "ship repairman."

<blockquote>a.      Cases Determining Whether Employee was Repairman</blockquote>

The plaintiffs cite the Fifth Circuit case of Gay v. Barge to support their position that

Lapp would not be considered a ship repairman.  915 F.2d 1007, 1010 (5th Cir. 1990).  In Gay,

the court stated

> When classifying an employee for purposes of determining
> whether a suit under § 905(b) is barred, we look not only at what
> the employee was doing at the moment he was injured.  We also
> look at whether the employee "regularly performs some portion of
> what is indisputably [ship-repair] work," or has been assigned for
> an appreciable period of time to do "substantial [ship-repair] work
> . . . even though his assignment to it is not 'permanent' . . . . If the
> employee's permanent duties, or his interim duties over an
> appreciable period, are such that he would be a covered ship
> repairer within the meaning of § 902(3) of the LHWCA, then he is
> barred from bringing suit against his employer under § 905(b).

Id.  The Gay court goes further by stating, "[t]wo primary considerations recommend looking to

the employee's overall duties or to his assignments for a significant time interval."  Id.  In their

opposition to the defendants' motion for summary judgment, the plaintiffs assert that "[i]n the

year from when Mr. Lapp was hired to when he boarded the SL PRIDE and was exposed to

malathion he spent 80% of his time in an office, about 5 days on ships and 45 days at a shipyard

where he was not engaged in any repair activities nor did he supervise those engaged in repair activities." The defendants assert that based on Lapp's time spent onboard vessels helping with repairs, it is abundantly clear that as a port engineer, Lapp was directly involved in vessel repairs. Therefore, the defendants argue that "[i]f Lapp was not employed for ship repair work because he spent, on balance, more time working out of his home, then a fireman is not employed to fight fires because he spends most of his time at the fire house waiting for alarms." (Defendants' Reply)

The defendants cite Easley v. Southern Shipbuilding Corp. to support their argument that Lapp falls within the classification of a ship repairman. In Easley, a mechanic, Easley, who worked for a shipyard, brought a negligence action against the shipyard for injuries he sustained while temporarily working as a deckhand. In Easley, the court held that "it is not necessary that a worker . . . actually build or repair ships to be included within these classifications. He must only be directly involved in the shipbuilding or repair process." 936 F.2d 839 (5th Cir. 1991). Furthermore, the court stated that "[a]s a mechanic who repaired and maintained equipment used in the shipbuilding and repair process he supported those who actually built and repaired ships. Clearly, Easley's duties directly furthered the shipbuilding or ship repair process. Therefore, he is a shipbuilder or a repairer for purposes of the LHWCA." Id. at 844. It is clear that Lapp's duties regularly involved ship repair work and that he was assigned to assist with repairs to the SEALAND PRIDE for an appreciable period of time. Lapp's duties as a port engineer directly furthered the ship repair process. Therefore, under Easley, Lapp would be classified as a ship repairman.

The defendants also cite Heise v. Fishing Co. of Alaska, Inc., 79 F.3d 903 (9th Cir. 1996)

and <u>Ducrepont v. Baton Rouge Marine Enterprises, Inc.</u>, 666 F.Supp. 882 (E.D. La. 1987), *aff'd*,

977 F.2d 393 (5th Cir. 1989) to further support their argument that Lapp falls within the

classification of a ship repairman under the LHWCA.  In <u>Heise</u>, the plaintiff was hired as a

temporary laborer, assigned to the category of "assistant engineer," to rebuild the main engine

and reweld a crack in the fuel tank.  The plaintiff was clearly hired to provide repair services.

The <u>Heise</u> court cites <u>New v. Associated Painting Services, Inc.</u>, 863 F.2d 1205 (5th Cir. 1989),

which held that "'repair' in § 905(b) must be given its ordinary meaning, 'to restore to a sound

or healthy state'. . . . [I]f [the worker] is hired to restore a vessel to safe operating condition, he

has been hired to perform 'repairing . . . services' under § 905(b).  If, however, he is hired to

preserve the vessel's current condition, he is performing routine maintenance not covered by this

section."  <u>Heise</u>, 79 F.3d at 908.  Based on that definition, it is clear that Lapp was hired to

participate in efforts to restore the SEALAND PRIDE to a safe operating condition rather than to

preserve her current condition.  In <u>Ducrepont</u>, the plaintiff was employed by a company that

cleaned and repaired barges.  "In his capacity as Vice President and Supervisor, plaintiff was

primarily charged with overseeing the cleaning, repairing, and fleeting services [his employer]

provided [to] various barge customers."  <u>Ducrepont</u>, 666 F.Supp. at 883-84.  Also, the plaintiff

was responsible for repairing the boilers.  The plaintiff, Heise, was injured when he slipped on a

ladder while leaving the barge and brought a negligence action against his employer-vessel

owner.  The court held that "supervisors of repair operations are persons 'employed to provide'

repair services for purposes of Section 5(b) of the LHWCA.  The 1984 Amendments apply to

those who oversee repair activities as well as to those actually performing the repair services

themselves."  <u>Id.</u> at 888.  Based on Lapp's duties to oversee the repair of the vessel, under the

analysis in <u>Ducrepont</u>, he was employed to provide repair services for purposes of the LHWCA.

These cases are instructive in interpreting whether or not Lapp should be considered a ship repairman under the statute.  Lapp asserts that he did not have authority to supervise anyone in his position as a port engineer, but the record sufficiently sets forth his various duties that involved supervising others and repairing the vessel.  Therefore, Lapp was a ship repairman even though his title was that of a port engineer, and his suit against his employer, USSM, is barred by the exclusivity of remedies under the LHWCA.  Furthermore, the plaintiffs' suit against MLL, to the extent it is based on MLL's assumption of USSM's liability, is barred.

Also, where a shore worker's suit against his employer is barred by the exclusivity of remedies under the LHWCA, his wife's claim for loss of consortium is also barred.  <u>Thibodeaux v. J. Ray McDermott & Co.</u>, 276 F.2d 42 (5th Cir. 1996).  Accordingly, because USSM and MLL are entitled to summary judgment on Lapp's § 905(b) claims, they are also entitled to summary judgment on Roxann Lapp's consortium claims.

Therefore, USSM and MLL's motion for summary judgment as to the following causes of action are granted: (1) the claims in the first cause of action against USSM, pursuant to 33 U.S.C. § 905(b); (2) the claims in the second cause of action against MLL as USSM's successor; and (3) Roxann Lapp's loss of consortium claim in the tenth cause of action against MLL to the extent that it is based on MLL's assumption of USSM's liability.

        **AND IT IS SO ORDERED**.

        **C. WESTON HOUCK**
        **UNITED STATES DISTRICT JUDGE**

November 7, 2008
Charleston, South Carolina